**Cholpon ALYMOVA, Petitioner,**

v.

**U.S. ATTORNEY GENERAL,
Respondent.**

**No. 14–13342
Non–Argument Calendar.**

United States Court of Appeals,
Eleventh Circuit.

Feb. 1, 2016.

Mark Citrin, Mark Citrin, PA, Miami, FL, for Petitioner.

Carmel Aileen Morgan, John D. Williams, Krystal Samuels, U.S. Department of Justice, Washington, DC, Nicole Guzman, DHS, Office of Chief Counsel, Orlando, FL, for Respondent.

Before MARTIN, JULIE CARNES, and ANDERSON, Circuit Judges.

PER CURIAM:

Petitioner Cholpon Alymova, a native and citizen of Kyrgyzstan, seeks review of the Board of Immigration Appeals's ("BIA") order affirming the Immigration Judge's ("IJ") denial of her application for asylum, withholding of removal, and relief under the United Nations Convention Against Torture ("CAT"). On appeal, Petitioner argues (1) that the IJ's adverse credibility determination is not supported by substantial evidence; (2) that the cumulative impact of the incidents she experienced rose to the level of past persecution; and (3) that she established a well-founded fear of future persecution based on a pat-

tern or practice of persecution of ethnic Uzbeks in Kyrgyzstan. After review, we deny the petition for review in part, and dismiss in part.[1]

## I. FACTUAL BACKGROUND

### A. Initiation of Removal Proceedings

In May 2012, Petitioner arrived in the United States on a non-immigrant exchange visitor's visa. In October 2012, the Department of Homeland Security ("DHS") issued Petitioner a notice to appear, charging her as removable pursuant to 8 U.S.C. § 1227(a)(1)(C)(i), for failing to comply with the conditions of her non-immigrant visa status. At a preliminary removal hearing, Petitioner conceded that she was removable as charged and indicated that she intended to apply for asylum, withholding of removal, and CAT relief.

### B. Asylum Application and Attached Statement

In February 2013, Petitioner filed her asylum application, claiming that she feared harm, mistreatment, and torture if returned to Kyrgyzstan because of her Uzbek ethnicity.[2] Petitioner stated that prior to her most recent entry (May 2012) into the United States, she had earlier entered this country in June 2011. Two months thereafter, in mid-August 2011, Petitioner claims to have received a phone call from her brother telling her that one of their sisters had been beaten because she was a "dirty Uzbek."[3] Although her brother urged her to remain in the United States, Petitioner nonetheless decided to return to Kyrgyzstan, asserting that she did so because she was worried about her family. When Petitioner arrived at the airport in Kyrgyzstan at 5:00 a.m., she was detained for two-and-a-half to three hours and questioned about her brother before she was allowed to leave.

In a statement attached to her application, Petitioner said that she had earlier experienced impolite treatment at the local university due to her Uzbek accent, with professors pretending not to understand her and classmates insulting her. In early-April 2010, there were "disturbances" in Bishkek, where Petitioner was attending school, and her brother had taken part in an unspecified "gathering" and had suffered a beating and returned home covered in bruises after having been arrested, jailed for 20 days, and tortured.

Petitioner then described four incidents that occurred after she returned to check on her family and in which she suffered violence on account of her ethnicity. On September 22, 2011, the Day of Kyrgyz Language, two guys began bothering Petitioner, asking her "what is this stinking Uzbek doing at our holiday." After Petitioner started walking home around 7:00 p.m., a group of six guys, including the two that had previously harassed her, called her names, spit at her, and beat her until she passed out, resulting in her being hospitalized for four days. Even though the police did not want to accept the report, Petitioner filed a police report about this incident, but a detective later demanded that she take back her statement because

---

1. Petitioner failed to raise any argument concerning the denial of withholding of removal or CAT relief, and thus, she has abandoned these claims. *See Sepulveda v. U.S. Att'y Gen.,* 401 F.3d 1226, 1228 n. 2 (11th Cir.2005).

2. Petitioner is a native and citizen of Kyrgyzstan who was born in Bishkek, Kyrgyzstan.

Further, her mother is Kyrgyz. Any claim to Uzbek ethnicity by Petitioner is derived from her father, who is Uzbek.

3. As discussed *infra,* the credibility of this assertion was questioned by the IJ.

it slandered the Kyrgyz people. On November 17, 2011, as Petitioner was leaving a café around 10:00 p.m., three people approached her, pulled out a knife, brushed the knife blade across her face, and told her that they would cut her if she did not withdraw her complaint. The next day, Petitioner withdrew her complaint.

On March 8, 2012, as Petitioner was leaving a café around midnight, a group of six guys surrounded her, made a derogatory remark about Uzbeks, hit her in the chest hard enough that she could not breathe, and kicked her in the leg causing her to fall down. After she was kicked in the head, she passed out, resulting in her being hospitalized for a week. When she went to the police to make a statement, the detective was rude, called her a "small Uzbek slut," told her that he did not have a way to catch all of the "hooligans," and tried to convince her to take back her statement. On April 17, 2012, Petitioner was called in to the police station to make another statement, and a different detective said he could not help her, that her case was one of "hooligans," and pressured her to withdraw her statement. Two days later, Petitioner began receiving threatening phone calls from an unknown number.

On April 26, 2012, as Petitioner was arriving home after class, Petitioner was forced into a car by a tall, athletically-built man. Two additional individuals were inside of the car, including the police detective who had most recently pressured her to withdraw her statement. After driving around for 20 minutes, the detective coerced Petitioner to sign a paper that admitted that she was "guilty" of an unspecified offense. Petitioner was told that she would be raped and killed if she did not sign the paper. After signing the paper, she was let go.

In addition to the incidents Petitioner experienced, she also stated that her sister had been beaten in November 2011 because she was an Uzbek, and was hospitalized for a week.

## C. Documentary Evidence

In support of her asylum application, Petitioner attached statements from her mother, brother, and sister. Each of the statements provided a brief description of the four incidents Petitioner referenced in her asylum application. The statements also averred that law enforcement officers interrogated Petitioner at the airport in Kyrgyzstan on September 2, 2011. None of the statements, including the one from Petitioner's sister, ever mentioned that Petitioner's sister had been beaten.

## D. Merits Hearing on Asylum Application

At a hearing before the IJ, Petitioner testified about her fear of returning to Kyrgyzstan and the four incidents she described in her asylum application. Petitioner testified that she had a visa interview at the United States Embassy on April 26 (which was also the same day she was allegedly pulled into the car by police). She did not tell United States officials about what had happened to her because she was afraid that these officials would inform the police officers who were patrolling outside the embassy, and that the latter would remove her from the embassy.

On cross-examination, Petitioner admitted that she did not tell embassy officials about being pulled into the car, and explained that she failed to mention this incident because of the police presence at the embassy. She then contradicted the above statement, explaining her non-disclosure by testifying that she went to the embassy at 8:00 a.m., and the incident had not occurred until after school at 1:00 p.m. Because the incident had happened after her embassy visit, it was impossible for

her to inform embassy officials. Petitioner was certain that her interview at the embassy occurred on the same day that she was pulled into the car. She also believed that the incident happened because police knew she had received a visa and they wanted her to sign a paper before she departed the country.

The DHS attorney then confronted Petitioner with her visa, which reflected that the visa had been issued on April 25, the day before the alleged April 26 incident. Petitioner testified that she did not remember the exact date of her visa interview, but she was sure that the incident occurred on April 26. She stated that it was sometimes hard for her to remember things because she had suffered two head injuries. Upon further questioning by her attorney, Petitioner contradicted her earlier versions of the event, stating that she did not remember whether her interview at the embassy was the same day as when she was forced into the car by the police.

### E. Decisions of the IJ and the BIA

The IJ denied Petitioner's claims for asylum, withholding of removal, and CAT relief. Citing serious inconsistencies in Petitioner's testimony and supporting evidence, the IJ found Petitioner not to be credible. The IJ further concluded that the specific incidents Petitioner experienced did not individually or cumulatively rise to the level of past persecution and that Petitioner had not established a well-founded fear of future persecution if she were returned to Kyrgyzstan. For the same reasons, the IJ denied Petitioner's application for withholding of removal and CAT relief.

Petitioner appealed to the BIA, challenging the IJ's adverse credibility determination and its finding that the incidents she experienced did not rise to the level of past persecution. The BIA affirmed the IJ's decision. The BIA determined that the record supported the IJ's adverse credibility finding, and that the IJ had cited specific and cogent reasons for its credibility determination. The BIA also concluded that the IJ's determination that Petitioner had not established a well-founded fear of future persecution based on her Uzbek ethnicity was not clearly erroneous.

## II. DISCUSSION

### A. Standard of Review

We review the BIA's decision as the final judgment, unless the BIA expressly adopted the IJ's decision, in which case we review both decisions. *Carrizo v. U.S. Att'y Gen.,* 652 F.3d 1326, 1330 (11th Cir. 2011). We also review the IJ's decision to the extent that the BIA adopted its reasoning or found the IJ's reasons to be supported by the record. *Seck v. U.S. Att'y Gen.,* 663 F.3d 1356, 1364 (11th Cir. 2011). Here, the BIA issued its own opinion, but agreed with several aspects of the IJ's decision and reasoning. Thus, we review the BIA's decision, as well as the IJ's decision to the extent the BIA found the IJ's reasons to be supported by the record. *Id.* at 1364.

We review factual findings, including credibility determinations, for substantial evidence. *Forgue v. U.S. Att'y Gen.,* 401 F.3d 1282, 1286 (11th Cir.2005). Under the substantial evidence test, we must affirm a determination "if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Id.* (quotation omitted). The evidence is viewed in the light most favorable to the agency's decision, drawing all reasonable inferences in favor of that decision. *Id.* Moreover, we are also precluded from re-weighing the evidence from scratch. *Xia v. U.S. Att'y Gen.,* 608 F.3d 1233, 1239 (11th Cir.2010). In other words, "[a] cred-

ibility determination, like any fact finding, may not be overturned unless the record compels it." *Forgue*, 401 F.3d at 1287 (quotations omitted).

### B. Adverse Credibility Determination and Past Persecution Claim

An applicant for asylum must meet the Immigration and Nationality Act's ("INA") definition of a refugee. 8 U.S.C. § 1158(b)(1)(A). The INA defines a refugee as a person who cannot return to his or her home country due to "persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." *Id.* § 1101(a)(42)(A). To establish eligibility for asylum, an applicant must demonstrate either past persecution, or a well-founded fear of future persecution, based on a statutorily-listed factor. *Ruiz v. U.S. Att'y Gen.*, 440 F.3d 1247, 1257 (11th Cir.2006). If the applicant demonstrates past persecution, there is a rebuttable presumption that she has a well-founded fear of future persecution. *Id.*

An applicant's testimony, if credible, may be sufficient to sustain her burden of proof, without corroborating evidence. *Forgue*, 401 F.3d at 1287. Conversely, if the applicant relies solely on her testimony, an adverse credibility determination may alone be sufficient to support the denial of an asylum application. *Id.* "If, however, the applicant produces other evidence of persecution, whatever form it may take, the IJ must consider that evidence, and it is not sufficient for the IJ to rely solely on an adverse credibility determination in those instances." *Id.*

Pursuant to the REAL ID Act of 2005, the IJ is to consider the totality of the circumstances and all relevant factors

when evaluating an applicant's credibility. 8 U.S.C. § 1158(b)(1)(B)(iii).[4] An adverse credibility determination may be based on (1) the applicant's demeanor, candor, or responsiveness; (2) the plausibility of the applicant's account; and (3) inconsistencies, inaccuracies, or falsehoods related to the applicant's statements, witnesses' statements, and other evidence in the record, regardless of whether they relate to the heart of the applicant's claim. *Id.* "Once an adverse credibility finding is made, the burden is on the [petitioner] to show that the IJ's credibility decision was not supported by 'specific, cogent reasons,' or was not based on substantial evidence." *Ruiz*, 440 F.3d at 1255 (quotations and alteration omitted). The fact that the applicant provides "tenable" explanations for the doubtful portions of her testimony does not compel reversal, particularly in the absence of corroborating evidence. *Chen v. U.S. Att'y Gen.*, 463 F.3d 1228, 1233 (11th Cir.2006).

 In the present case, substantial evidence supports the BIA's and IJ's finding that Petitioner's testimony was not credible. Although we conclude that the BIA unreasonably determined that a purported inconsistency existed between Petitioner's asylum application and her documentary evidence, our conclusion as to that inconsistency does not compel reversal because the BIA and IJ offered other specific and cogent reasons for the adverse credibility determination, and those reasons are supported by substantial evidence. In particular, the BIA and IJ identified material inconsistencies between Petitioner's testimony and the documentary evidence submitted in support of her application. We first address the inconsistencies supported by substantial evidence, then turn to the

---

**4.** Because Petitioner's asylum application was filed after May 11, 2005, it is subject to the

REAL ID Act of 2005. *See* Pub. L. No. 109–13, § 101(h)(2), 199 Stat. 231, 303, 305.

perceived inconsistency identified by the IJ and BIA.

The BIA and IJ properly noted that Petitioner gave conflicting testimony about the date of her visa interview and the April 26 incident. The IJ and BIA considered this a crucial inconsistency given Petitioner's certainty that she visited the embassy on the same day that she got pulled into the car, and her detailed description of the sequence of events that day. Petitioner did not acknowledge the untruthfulness of the above chronology until she was confronted with the fact that her visa was issued on April 25, at which point, she changed her story and said she could not remember whether she was pulled into the car on the same day that she interviewed for her visa. Petitioner's only explanation for the inconsistency was that her previous head injuries caused her to have memory problems, but as noted by the BIA and IJ, the record does not contain any medical evidence supporting Petitioner's claim that her confusion is related to the residual effects of head injuries. Additionally, the IJ and BOA observed that Petitioner became confused and unable to come up with any other explanation during this portion of the testimony, which demeanor undermined her credibility and was a proper consideration. *See Todorovic v. U.S. Att'y Gen.*, 621 F.3d 1318, 1325 (11th Cir.2010) (explaining that the IJ is afforded significant deference in assessing an applicant's demeanor when making credibility determinations); 8 U.S.C. § 1158(b)(1)(B)(iii).

Petitioner now concedes that the visa interview did not occur on the same day as the April 26 incident, and therefore her testimony on that point was not true. She nonetheless argues that this inconsistency does not support an adverse credibility determination because it was minor and inconsequential. We find this argument unpersuasive. The REAL ID Act, which governs Petitioner's asylum claim, makes clear that an adverse credibility determination can be based on any inconsistency, regardless of whether it goes to the heart of the applicant's claim. 8 U.S.C. § 1158(b)(1)(B)(iii); *Chen*, 463 F.3d at 1233 (rejecting petitioner's argument that inconsistencies were inconsequential because they did not go to the heart of the claim).

Another discrepancy relied upon by the BIA and IJ was that Petitioner claimed that her sister had been beaten on two occasions based on her Uzbek ethnicity. Yet, none of the statements from Petitioner's family members, which were submitted in support of her asylum application, ever mentioned her sister's alleged beatings. Petitioner contends that the IJ impermissibly considered the absence of corroborating evidence in making the credibility determination as to this issue. However, we have previously determined that substantial evidence supported an adverse credibility determination, where a petitioner alleged that he was at a political rally when his mother was killed, but none of the statements from his family members affirmed that he was politically active or present at the rally. *See Carrizo*, 652 F.3d at 1332. Given that the sister's own statement did not even mention the beatings that were purportedly inflicted on her, Petitioner's perceived lie on this point constituted a persuasive reason to question her credibility. *Id.*

■ Finally, the BIA and IJ identified an additional potential inconsistency in that Petitioner's mother's statement indicated that Petitioner was interrogated at the airport in Kyrgyzstan on September 2, 2011, while Petitioner's asylum application purportedly provided a different date. However, the record shows that Petitioner's asylum application did not provide any specific date for the airport interrogation. In fact, Petitioner stated in her application

that she received a phone call from her brother in mid-August 2011 while she was in the United States, that she later returned to Kyrgyzstan because she was concerned for her family, and that when she arrived at the airport at 5 a.m., she was detained and interrogated by authorities. These facts do not contradict Petitioner's mother's statement averring that Petitioner was interrogated at the airport on September 2, 2011. Because there was nothing contradictory about Petitioner's asylum application and her mother's statement concerning the airport interrogation, we are compelled to conclude that no reasonable factfinder would consider this an inconsistency. *See Kueviakoe v. U.S. Att'y Gen.*, 567 F.3d 1301, 1305–06 (11th Cir. 2009) (rejecting purported inconsistencies in Petitioner's testimony because the inconsistencies were not supported by the record).

■ Our determination with respect to the purported inconsistency concerning the airport interrogation, however, does not compel reversal of the adverse credibility finding. As discussed previously, the BIA and IJ offered two other specific and cogent reasons for finding Petitioner not credible, and those reasons are supported by substantial evidence.[5] *Cf. Xia*, 608 F.3d at 1240 (concluding that the totality of the record adequately supported the adverse credibility determination, where the BIA identified at least one internal inconsistency and one omission, and the petitioner did not provide any corroborating evidence to rebut those inconsistencies). Accordingly, the totality of the circumstances, including the discrepancies and the IJ's observations of Petitioner's demeanor, adequately support the adverse credibility finding. Therefore, substantial evidence supports the IJ's and BIA's denial of Petitioner's asylum application based on a lack of past persecution.[6]

## C. Future Persecution Claim

■ Turning to Petitioner's future persecution claim, we must first address our jurisdiction to review this claim, which we review *de novo*. *Amaya–Artunduaga v. U.S. Att'y Gen.*, 463 F.3d 1247, 1250 (11th Cir.2006). A court may not review a final order of removal unless "the alien has exhausted all administrative remedies available to the alien as of right." 8 U.S.C. § 1252(d)(1). If a petitioner has failed to exhaust her administrative remedies by not raising an issue in her brief to the BIA, we lack jurisdiction to consider the claim. *Amaya–Artunduaga*, 463 F.3d at 1250.

We lack jurisdiction to review Petitioner's argument that she established a well-founded fear of future persecution based

---

**5.** Additionally, Petitioner challenges the IJ's finding that she did not provide sufficient details concerning the injuries she received as a result of the September 22 and March 8 incidents. We do not address this argument because the BIA did not adopt (or agree) with the IJ's finding on this point. *Seck*, 663 F.3d at 1364; *Carrizo*, 652 F.3d at 1330. Regardless, the IJ's discussion of the September 22 and March 8 incidents related to whether the incidents individually or cumulatively rose to the level of past persecution, not whether Petitioner's description of these incidents undermined her credibility.

**6.** Petitioner also argues that the IJ erred in finding that the cumulative impact of the incidents she experienced did not rise to the level of past persecution. We do not address this issue because the BIA did not adopt (or agree with) the IJ's finding that the incidents did not rise to the level of past persecution. *See Seck*, 663 F.3d at 1364; *Carrizo*, 652 F.3d at 1330. Instead, the BIA's decision reflects that it affirmed the IJ's past persecution determination based solely on the adverse credibility determination and did not consider Petitioner's argument that the cumulative impact of the incidents she experienced rose to the level of past persecution.

on a State Department Country Report reflecting a pattern or practice of persecution against ethnic Uzbeks in Kyrgyzstan. Petitioner did not raise this argument before the BIA, but instead raised it for the first time on appeal. *See id.* Accordingly, we dismiss Petitioner's petition for review as to this issue.

**PETITION DENIED IN PART AND DISMISSED IN PART.**